**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM GORDON**, individually and on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**ADAPTHEALTH CORP.**,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff William Gordon, individually and on behalf of all others similarly situated, by and through his undersigned counsel, brings this Class Action Complaint against AdaptHealth Corp. Mr. Gordon alleges the following upon information and belief, based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

## INTRODUCTION

1. Mr. Gordon brings this class action lawsuit on behalf of himself and all individuals who entrusted AdaptHealth with sensitive personally identifiable information ("PII")[1] and protected health information ("PHI") (together, "Private Information") and whose unencrypted Private Information was compromised by a June 5, 2026, security breach of AdaptHealth's electronic data systems (the "Data Breach" or the "Breach").

[1] The Office of Management and Budget defines PII as information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2. Mr. Gordon's claims arise from AdaptHealth's failure to carry out its duty to securely store and transfer the Private Information Mr. Gordon entrusted to AdaptHealth when he purchased products or services from it.

3. AdaptHealth is one of the nation's largest full-service home medical equipment ("HME") and services companies, providing in-home services and deliveries (and some in-store sales), supporting patients in 668 locations across 48 states, serving nearly 5 million patients annually, and making nearly 43,000 home deliveries daily. In 2025, it earned net revenues exceeding $3 billion.

4. AdaptHealth provides HME, medical supplies, and related services to patients with a range of medical conditions, many of them chronic, including respiratory and heart conditions, sleep disorders, diabetes, urinary and digestive diseases, mobility limitations requiring supportive equipment, and injuries requiring orthotic or wound care, among others. It also provides equipment to patients discharged from hospitals and similar facilities who need medical equipment to safely return home and those receiving end-of-life care.

5. AdaptHealth also provides insurance verification, prescriber coordination, and patient set-up services.

6. AdaptHealth achieved this growth and national scale through its acquisition of local or regional medical supply companies, including AeroCare Holdings Inc., a leading national respiratory and home medical equipment distribution platform, and through contracts (sometimes exclusive) with major integrated health systems and national insurance networks.

7. On July 2, 2026, AdaptHealth reported, in a Form 8-K filing with the United States Securities and Exchange Commission, that, on or about June 15, 2026, it was contacted by a hacker claiming to have obtained Private Information from AdaptHealth's systems. It reported this

information to the SEC after concluding that, due to the nature and potential volume of data at risk, the incident was material.

8. AdaptHealth disclosed that its own investigation confirmed that the hacker gained unauthorized access to AdaptHealth's cloud-based environment, including certain internal patient management systems and document storage platforms, that it exfiltrated patients' Private Information, and that the hacker was able to access external electronic health record ("EHR") systems and portals.

9. EHRs ordinarily contain patients' comprehensive medical histories, including past diagnoses, lab results, imaging reports, and medications, which allow medical providers to share patient data across healthcare providers and systems and coordinate care. Social Security Numbers may be used in these records to link health information across records. AdaptHealth's negligence in protecting Mr. Gordon and the Class's Private Information also resulted in the compromise of one or more EHRs.

10. Based on the information and systems accessed, the hackers specifically and successfully targeted the Private Information of Mr. Gordon and Class members for exfiltration.

11. It was not until August 14, 2026, that AdaptHealth finally began notifying victims of the Data Breach by mail and filing reports with State Attorneys General. The mailed notice informed victims that the hackers gained access to AdaptHealth's systems on June 5, 2026, and took with them the victims' Private Information, including their names, contact information, demographic information, health information, and their health insurance plan names and policy numbers. Although AdaptHealth has not identified what demographic information was exfiltrated, demographic information is ordinarily understood to include (in addition to name and address), date of birth, race, ethnicity, gender/gender identity, marital status, and primary language.

According to the National Institutes of Health, in the healthcare registries, demographics may also include disease diagnosis, family history of disease, income level, employment status or occupation, location, and level of education.

12. The sensitive nature of the data exfiltrated during the Data Breach underscores that Mr. Gordon and Class Members have suffered irreparable harm. He and other Class Members have lost the ability to control their Private Information and are subject to an increased risk of identity theft and other forms of fraud.

13. Based on AdaptHealth's reports to certain State Attorneys General identifying the number of their state's residents whose Private Information was compromised, the proposed Class likely includes hundreds of thousands, if not millions, of individuals nationally.[2]

14. AdaptHealth owed Mr. Gordon and Class Members a duty to take all reasonable and necessary measures to keep the Private Information it collected safe and secure from unauthorized access. AdaptHealth solicited, collected, used, and derived a benefit from the Private Information, but despite having the financial wherewithal and personnel necessary to prevent the Data Breach, breached that duty by failing to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it maintained for Plaintiff and Class Members. That failure exposed Plaintiff's and Class Members' Private Information and provided hackers access to external electronic health records systems where yet more sensitive health information is stored.

15. AdaptHealth failed to: (i) adequately protect the Private Information of Plaintiff and Class Members; (ii) warn Plaintiff and Class Members of AdaptHealth's inadequate

---

[2] For example, AdaptHealth reported to the Texas Attorney General on or around August 14, 2026, that the Private Information of more than 143,000 Texans was compromised during the Data Breach. In its report to the Vermont State Attorney General, AdaptHealth identified more than 40,000 state residents impacted.

information security practices; (iii) effectively secure hardware and electronic systems containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; (iv) adequately train its personnel to identify and detect security risks; and (v) timely notify Plaintiff and Class Members of the Data Breach.

16. As a result of AdaptHealth's negligent digital security practices and notice process, Mr. Gordon's and Class Members' Private Information was exfiltrated by cybercriminals. Plaintiff and Class Members have suffered and will continue to suffer injuries, including: financial losses caused by misuse of their Private Information; the loss or diminished value of their Private Information as a result of the Data Breach; lost time associated with detecting and preventing identity theft; invasion of privacy; and theft of personal and financial information.

17. Mr. Gordon brings the following claims against AdaptHealth on his own behalf and all those similarly situated, for: negligence; negligence per se; breach of implied contract; and unjust enrichment.

18. He seeks to remedy these harms and prevent any future data compromise on behalf of himself, and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to AdaptHealth's negligent data security practices.

## PARTIES

19. Plaintiff William Gordon is a citizen and resident of Germantown, Washington County, Wisconsin. He is an AdaptHealth customer and, on or about August 14, 2026, received mailed notice from AdaptHealth that his Private Information was compromised in the Data Breach.

20. AdaptHealth is a Pennsylvania-based company incorporated in Delaware with its principal place of business located at 555 East North Lane, Ste. 5075, Conshohocken, PA 19428-2490.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one Class Member resides in a different state from AdaptHealth, and there are over 100 proposed Class Members.

22. This Court has general personal jurisdiction over AdaptHealth because AdaptHealth is at home in Pennsylvania, maintaining its principal place of business in Pennsylvania, regularly conducting business in this State, and having sufficient minimum contacts in this State.

23. Venue is proper in this Court because AdaptHealth's principal place of business is located in this District and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. AdaptHealth's Business and Class Members' Private Information

24. AdaptHealth is one of the nation's largest full-service home medical equipment and services company, supporting 5 million patients annually and making nearly 43,000 home deliveries daily from 668 locations in 48 states.

25. Upon information and belief, AdaptHealth made express and implied promises and representations to individuals, including Plaintiff and Class Members, that it would keep the

Private Information it collected from them secure and confidential and maintain the information's privacy.

26. AdaptHealth's May 2026 Privacy Notice posted on its website assures patients that their "privacy is of [its] utmost concern" and that it takes "great care with [its customers'] personal information to ensure [patients] are respected and protected at all times." The policy also identifies AdaptHealth's legal obligation to "[m]aintain the privacy of protected health information."

27. Mr. Gordon and Class Members provided their Private Information to AdaptHealth with the reasonable expectation and on the mutual understanding that AdaptHealth would comply with its obligations to keep such information confidential and secure from unauthorized access.

28. As a result of collecting and storing Plaintiff's and Class Members' Private Information for its own financial benefit, AdaptHealth had a continuous duty to adopt and employ reasonable measures to protect Plaintiff's and the Class Members' Private Information from disclosure to third parties.

**B. The Data Breach and AdaptHealth's Failure to Prevent, Identify, and Timely Report It**

29. On or about June 15, 2026, AdaptHealth received a communication from a hacker claiming to have obtained Private Information from the Company's systems. According to media reports, the cybercriminal organization ShinyHunters admitted responsibility for the attack on its dark web leak site.

30. AdaptHealth publicly confirmed to the SEC that, on June 5, 2026, a hacker gained unauthorized access to its cloud-based environment, including certain patient-management and document-storage platforms, and exfiltrated patients' Private Information, including a stored password file associated with insurance billing and other health information and also gained access

to certain electronic health record system portals that contain comprehensive personal health records.

31. Based on the number of patients AdaptHealth serves (5 million) and AdaptHealth's disclosure to certain state Attorneys General of the number of state residents affected, the hackers likely exfiltrated the Private Information of hundreds of thousands, if not millions, of individuals.

32. While AdaptHealth claims to have discovered the Data Breach as early as June 15, 2026, it did so only because the hackers contacted it; its own systems were insufficient to detect the intrusion. By then, the hackers had been exfiltrating data from AdaptHealth's systems for at least 10 days.

33. Defendant did not inform victims of the Data Breach until August 14, 2026—more than two months after their Private Information had been stolen. Indeed, Plaintiff and Class Members were wholly unaware of the Data Breach until they received the Notice of Data Breach issued by Defendant.

34. According to the Notice AdaptHealth sent to Mr. Gordon and other victims of the Data Breach, PII and PHI were exposed as a result of the Data Breach and may have included patient names, contact information, demographic information, health insurance information, and health information. AdaptHealth did not explain what demographic information was exposed, but the term ordinarily encompasses date of birth as well as other information (e.g., employment, race and ethnicity, language, education level, and, in some cases medical information). AdaptHealth's notification to the Texas Attorney General indicated that date of birth information was, in fact, compromised.

35. Despite its knowledge of the inherent risks of cyberattacks, and notwithstanding the Federal Trade Commission's ("FTC") data security principles and practices, AdaptHealth

failed to disclose that its systems and security practices were inadequate to reasonably safeguard Plaintiff's and Class Members' Private Information. The FTC directs businesses to use an intrusion detection system to expose a breach as soon as it occurs, monitor activity for attempted hacks, and have an immediate response plan if a breach occurs. Immediate notification of a Data Breach is critical so that those impacted can take measures to protect themselves.

36. AdaptHealth thus not only failed to take precautions designed to keep individuals' Private Information secure from unauthorized intrusion, but it also failed to implement monitoring systems that would have detected the intrusion when it was first attempted, and to timely notify the victims of the breach that their information had been compromised and exfiltrated.

37. While AdaptHealth purportedly attempted to mitigate and remediate the unauthorized activity once it finally learned of the Data Breach, it cannot deny and has not denied that there was unauthorized access to the sensitive Private Information of Plaintiff and Class Members.

38. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**C. AdaptHealth Knew or Should Have Known of the Risk of a Data Breach**

39. As HIPAA-covered entities handling Private Information, AdaptHealth was aware or should have been aware of risk that it was a likely target for a cyberattack on its systems holding patients' Personal Information, given the substantial increase in cyberattacks and/or data breaches in recent years, particularly in the health care industry.

40. According to the Identity Theft Resource Center, 2025 saw a record 3,322 data breaches, exposing approximately 1.3 billion sensitive records—a 79% increase from 2020.

41. Between January and mid-June 2026, according to the U.S. Health and Human Service Office for Civil Rights, at least 19 million individuals had their PHI exposed or compromised by data breaches at healthcare institutions ranging from small hospitals to large healthcare and healthcare management and other service providers. In June 2026 alone, ShinyHunters—the criminal organization reportedly taking responsibility for the attack on AdaptHealth—also attacked OneMedical and DentaQuest, exfiltrating protected health information.

42. In light of past high-profile data breaches at leading healthcare companies in recent years, as reported by the HIPAA Journal—including, for example, Conduit Business (62 million people, 2025), Davita (2.7 million patients, 2025) Aflac (14 million patients, 2025); Change Healthcare (192 million people, 2024), Kaiser Foundation Health Plan (13.4 million patients, 2024), Centers for Medicare & Medicaid Services (3,1 million patients, 2024), HCA Healthcare (11 million patients, July 2023), Managed Care of North America (8.8 patients, March 2023), Shields Health Care Group (2 million patients, March 2022), Broward Health (1.3 million patients, January 2022), OneTouchPoint (2.6 million patients, July 2022), Trinity Health (3.3 million patients, May 2020)—AdaptHealth knew or reasonably should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

43. Indeed, cyberattacks against the healthcare industry have been common for over a decade. As early as 2014, the FBI warned healthcare and medical device entities like AdaptHealth that they were being targeted by cybercriminals, counseling that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)." The agency issued another warning in 2019.

44. Despite the prevalence of public announcements of data breach and data security breaches, especially among healthcare facilities, and AdaptHealth's own acknowledgment of its duties to keep Private Information private and secure, AdaptHealth failed to take appropriate steps to prevent the Private Information of Plaintiff and Class Members from being compromised.

45. This readily available and accessible information confirms that, prior to the Data Breach, AdaptHealth knew or should have known that: (i) cybercriminals were targeting entities such as AdaptHealth, (ii) cybercriminals were ferociously aggressive in their pursuit of entities such as AdaptHealth, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals frequently use ransomware and other forms of extortion to threaten the release of stolen or encrypted PII and PHI.

46. In light of the information readily available and accessible before the Data Breach, AdaptHealth knew or should have known that there was a foreseeable risk that Plaintiff's and Class Members' Private Information could be accessed, exfiltrated, and published as the result of a cyberattack and should have implemented enhanced and adequate security measures to protect and secure Plaintiff's and Class Members' Private Information. Knowing the risk, and despite its acknowledged duty to protect that information, AdaptHealth failed to do so.

**D. Plaintiff's Experience and Injuries**

47. Plaintiff is a patient or customer of AdaptHealth.

48. As a condition of receiving services and/or products from AdaptHealth, Plaintiff was required to provide his Private Information to AdaptHealth.

49. Plaintiff provided his Private Information to AdaptHealth and trusted that AdaptHealth would use reasonable measures to protect it according to state and federal laws.

50. As a result of AdaptHealth's inadequate cybersecurity measures and data destruction policies, Plaintiff's Private Information was compromised and exfiltrated by cybercriminals and, given the purpose of the hack and the nature of ShinyHunters, may be available for sale on the Dark Web.

51. AdaptHealth first notified Plaintiff of the Data Breach by letter, dated August 14, 2026, which was substantially later than when AdaptHealth knew of the Data Breach.

52. AdaptHealth deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to timely notify him about the Data Breach.

53. Plaintiff suffered actual injury from the exposure of his Private Information—which violates his rights to privacy.

54. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that AdaptHealth was required to adequately protect.

55. As a result of the Data Breach, Plaintiff has spent time and made reasonable efforts to mitigate its impact, including but not limited to researching the Data Breach, reviewing credit card and financial account statements.

56. Plaintiff will continue to spend considerable time and effort monitoring his accounts to protect himself from identity theft. Plaintiff fears for his personal financial security and uncertainty over what Private Information was exposed. Plaintiff has and is experiencing anxiety, stress, fear, and frustration as a result of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

57. In the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam phone calls, voicemails, and text messages.

58. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse of his Private Information resulting from his Private Information being placed in the hands of unauthorized third parties. This injury is worsened by AdaptHealth's failure to promptly inform Plaintiff about the Data Breach.

59. Once an individual's Private Information is for sale and access on the Dark Web, cybercriminals can use the stolen and compromised Private Information to gather and steal even more information.

60. Plaintiff has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains in AdaptHealth's possession, is protected and safeguarded from future breaches.

61. Plaintiff also has a continuing interest in lifetime credit monitoring and identity theft monitoring on account of the Data Breach.

**E. Plaintiff and Class Members Suffered Common Injuries and Damages Due to AdaptHealth's Conduct**

62. AdaptHealth's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately injured Plaintiff and Class Members by the resulting disclosure of their Private Information in the Data Breach.

63. Because of AdaptHealth's failure to prevent the Data Breach, Plaintiff and Class members suffer—and will continue to suffer—damages. These damages include, among others, monetary losses, lost time, anxiety, and emotional distress. Plaintiff and Class Members also suffered, or are at an increased risk of suffering:

a. identity theft and fraud;

b. healthcare fraud;

c. loss of time to mitigate the risk of identity theft and fraud;

d. diminution in value of their Private Information;

e. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

f. lost benefit of the bargain and opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, inter alia, preventing, detecting, contesting, and recovering from identity theft and fraud;

g. delay in receipt of tax refund monies;

h. loss of the opportunity to control how their Private Information is used;

i. compromise and continuing publication of their Private Information;

j. unauthorized use of their stolen Private Information;

k. invasion of privacy; and

l. continued risk to their Private Information—which remains in AdaptHealth's possession and is thus at risk for futures breaches so long as AdaptHealth fails to take appropriate measures to protect the Private Information.

**F. Substantial Increased Risk of Continued Identity Theft**

64. Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

65. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201 (2013).

66. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including

"[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

67. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market (aka the dark web) to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

68. The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web because it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, the CIA's web address on the surface web is cia.gov, but on the dark web, the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

69. The unencrypted Private Information of Plaintiff and Class Members has or will end up for sale on the dark web because that is the modus operandi of hackers. Unencrypted and detailed Private Information may also fall into the hands of companies that will use it for targeted marketing without the consent of Plaintiff and Class Members or to commit other frauds. Unauthorized individuals can easily access Plaintiff's and Class Members' Private Information.

70. The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the criminal information black market for years and is one of its most valuable commodities. According to Experian, a credit-monitoring service,

stolen Private Information can be worth up to $4,000.00 depending on the type of information obtained. Criminals frequently post and sell stolen information openly and directly on the "dark web"—further exposing the information.

71. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the Private Information.

72. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

73. For example, a data thief armed with just a name and date of birth (which are among the data compromised in the Data Breach) can use a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

74. According to a January 2026 HIPAA Journal article, "[h]ealthcare organizations, especially healthcare providers, are attractive targets for hackers as they store vast amounts of valuable patient data" which includes "highly detailed" data, "including demographic data, Social Security numbers, financial information, health insurance information, and medical and clinical data, and that information can be easily monetized." Further, "misuse of medical records is harder to detect than misuse of other types of personal data . . . meaning medical records can be misused

for longer than other types of personal data." For example, while credit card fraud is typically readily detected, the fraud facilitated by healthcare data can result in fraudulent debts that build up over years before they are detected. The article identified the ways in which healthcare information can be misused: identify theft to obtain loans and credit cards in the victims' names; obtain expensive medical services, Medicare and Medicaid benefits, and prescription medications; file fraudulent tax returns to obtain rebates; and develop convincing spearphishing (a targeted phishing attack), smishing (text message phishing), and vishing (phone calls and voicemail phishing) impersonating hospital, healthcare personnel, or pharmacies identified in the records; among others.

75. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's Private Information to obtain government benefits; obtain a job using the victim's information; rent a house; and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.

76. One example of criminals piecing together bits and pieces of compromised Private Information to create comprehensive dossiers on individuals is called "Fullz" packages.[3] These dossiers are both shockingly accurate and comprehensive. With "Fullz" packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy

[3] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in hand.

to assemble complete dossiers on individuals. For example, they can combine the stolen Private Information with unregulated data found elsewhere on the internet.

77. The development of "Fullz" packages means that the Private Information exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet or dark web. In other words, even if certain information such payment card numbers may not be included in the Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is misuse that is fairly traceable to the Data Breach.

78. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, complaints of Internet-enabled crimes average 3,000 per day in 2025, and losses resulting from Internet enabled crime exceeded $20 billion to individuals and business victims.

79. According to the FBI, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Yet AdaptHealth waited two months to tell Plaintiff, the Class, and the State Attorneys General that the Private Information of Plaintiff and the Class was stolen.

80. AdaptHealth's failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff's and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take necessary steps to mitigate the harm caused by the Data Breach.

81. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online. For example, media reports indicate that emails leaked by ShinyHunters—the

cybercriminal group reportedly taking responsibility for the Data Breach—on the dark web after other attacks have been exploited by scammers seeking to extort innocent victims by harassing them via email and threatening to release embarrassing information about them.

82. In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their credit reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

83. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

**G. Loss of Time Spent Mitigating the Risk of Identify Theft and Fraud**

84. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, victims take steps and spend time to address the dangerous situation, learn about the breach to protect themselves of the increased risk of identity theft and other fraud.

85. In the event that Plaintiff and Class Members experience actual identity theft and fraud, a United States Government Accountability Office's 2007 report confirmed that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."

86. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial, insurance, and healthcare accounts for many years to mitigate that harm.

87. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial and healthcare institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover, and filing reports with local police and federal enforcement agencies.

88. These efforts are consistent with the steps the FTC identifies for data breach victims to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.

89. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, because of AdaptHealth's conduct that caused the Data Breach.

**H. Diminished Value of Private Information**

90. Personal data like Private Information is a valuable property right.

91. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk–reward analysis illustrates beyond doubt that Private Information has considerable market value.

92. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.

93. So sophisticated is the data marketplace that consumers can actually sell their non-public information directly to a data broker, who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $60 a year.

94. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for criminals.

95. But this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, lessening its value.

**I. Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary.**

96. To date, AdaptHealth has done little to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach.

97. Given the type of targeted attack here and sophisticated criminal activity, the type of information involved, and the modus operandi of cybercriminals, there is a strong probability that entire batches of stolen information have been or will be placed on the dark web for sale and purchase by criminals intending to use it for identity theft crimes—e.g., opening bank accounts in

the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims. Even breached corporations that comply with cyberextortion demands (demands for payment in exchange for deleting the stolen data) may later find that the Private Information is still circulating or they may face a second or third extortion demand, further risking further disclosure of the leaked data.

98. Such fraud may go undetected until debt collection calls commence months, or even years later. An individual may not know that their information was used to file for unemployment benefits or federal healthcare programs until law enforcement notifies the individual's employer or healthcare provider of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

99. Further, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel their cards and request a replacement. Date of birth and health information, among the information exfiltrated by the Data Breach, is immutable; it is impossible to "close" and, in most cases, to change.

100. Consequently, Plaintiff and Class Members face a present and ongoing risk of fraud and identity theft for many years into the future.

101. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for AdaptHealth's failure to safeguard their Private Information.

**J. Lost Benefit of the Bargain**

102. Further, AdaptHealth's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

103. When agreeing to provide their Private Information, which was a condition of receiving goods and/or services from AdaptHealth, Plaintiff and Class Members understood and expected that they were, in part, paying for goods and/or services in exchange for data security to protect the Private Information they were required to provide.

104. Plaintiff values data security. Indeed, data security is an important consideration for seeking goods and/or services.

105. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey." Therein, Cisco reported the following:

> For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data.

106. Cisco reported that "[p]rivacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly." 89% of consumers stated, "I care about data privacy." 83% of consumers declared, "I am willing to spend time and money to protect data" and "I expect to pay more" for privacy.

107. AdaptHealth did not provide the expected data security. Accordingly, Plaintiff and Class Members received goods and/or services of a lesser value than they reasonably expected to receive under the bargains struck with AdaptHealth.

**K. AdaptHealth Could Have Prevented the Data Breach.**

108. Data breaches are preventable. As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions." Thompson added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised." She concluded that "[m]ost of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures" and that "[a]ppropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."

109. AdaptHealth failed to adhere to several industry-standard best practices.

**L. AdaptHealth Failed to Adhere to FTC Guidelines.**

110. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as AdaptHealth, should employ to protect against the unlawful exposure of Private Information.

111. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should, among other things: (i) protect the personal information that they keep; (ii) properly dispose of personal information that is no longer needed; (iii) encrypt information stored on computer networks; (iv) understand their network's vulnerabilities; and (v) implement policies to correct security problems.

112. The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system (as occurred in the Data Breach) and have a response plan ready in the event of a breach.

113. The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks and use proper authentication procedures, such as multi-factor authentication; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

114. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect individuals' data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

115. AdaptHealth's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff and Class Member Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

**M. AdaptHealth Failed to Follow Industry Standards.**

116. As discussed *supra*, experts studying cybersecurity routinely identify financial and health-related corporations as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

117. Similar to FTC Guidance, several best practices have been identified that—at a minimum—should be implemented by businesses like AdaptHealth. These industry standards include: educating all employees regarding cybersecurity; require strong passwords; create multi-layer security, including firewalls, anti-virus, and anti-malware software; use encryption (making data unreadable without a key); require multi-factor authentication; ensure data is backed up; and limit which employees can access sensitive data or systems.

118. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and providing training regarding critical points.

119. Moreover, companies should retain personal data only as necessary, with legal justification. Personal data should not be stored beyond the time necessary to achieve its initial purpose of collection. In line with industry standard practices, AdaptHealth should have promptly deleted any data it no longer needed.

120. Upon information and belief, AdaptHealth failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both (a) the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1 (identity issuance), PR.AC-3 (remote access management), PR.AC-4 (least privilege), PR.AC-5 (network integrity), PR.AC-6 (identity proofing), PR.AC-7 (authentication), PR.AT-1 (security training), PR.DS-1 (encryption), PR.DS-5 (data loss prevention), PR.PT-1 (audit logging), PR.PT-3 (restricting systems to only essential configurations), and network monitoring standards including DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2 (incident communication), and (b) the Center for

Internet Security's Critical Security Controls (CIS CSC), which are established standards in reasonable cybersecurity readiness.

121. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, AdaptHealth opened the door to the criminals—thereby resulting in the undetected Data Breach and AdaptHealth's subsequent delay in reporting it.

**N. AdaptHealth Failed to Follow HIPAA Data Security Standards**

122. AdaptHealth also failed to meet HIPAA standards to safeguard Private Information. As a healthcare service provider handling patient data, AdaptHealth is a covered entity under HIPAA (45 C.F.R. § 160.103) and is required to comply with the HIPAA Privacy Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C ("Security Standards for the Protection of Electronic Protected Health Information").

123. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

124. AdaptHealth is thus subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

125. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information that is kept or transferred in electronic form. HIPAA covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. These safeguards include physical, technical, and administrative components.

126. The Data Breach is considered a breach under the HIPAA Privacy Rule because it involved access to PHI not permitted under the HIPAA Privacy Rule: A breach under the HIPAA Privacy Rule is defined as "the acquisition, access, use, or disclosure of PHI in a manner not permitted under the [HIPAA Privacy Rule] which compromises the security or privacy of the PHI." *See* 45 C.F.R. 164.40 AdaptHealth failed to meet these standards for the care and treatment of PHI.

**O. The Harm Caused by the Data Breach Now and Going Forward**

127. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). As the New York State Police website advised: "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."

128. The type of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft.

129. Plaintiff and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach.

130. Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

131. When malicious actors infiltrate companies and copy and exfiltrate the Private Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.

132. For example, when the U.S. Department of Justice announced their seizure of SSNDOB—one of the largest online "dark markets"— SSNDOB had a catalogue of private information for more than 24 million people, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Marketplaces similar to the now-defunct SSNDOB continue to be awash with PII globally.

133. PII remains of high value to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. One source estimates that personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200. A single medical record, according to other industry research, can sell for between $250 and $1,000. Access to EHR systems, as the hackers obtained during the Data Breach, is particularly valuable. Criminals can also purchase access to entire company data breaches from $900 to $4,500.

134. As a result of the Data Breach, the Private Information of Plaintiff and Class Members has been exposed to criminals for misuse. The injuries suffered, or likely to be suffered, by Plaintiff and Class Members as a direct result of AdaptHealth's Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Data Breach; (d) invasion of privacy; (e) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data Breach; (f) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (g) damage to and diminution in value of their personal data entrusted to AdaptHealth with the mutual understanding that AdaptHealth would safeguard

their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (h) the continued risk to their Private Information, which remains in the possession of AdaptHealth, and which is subject to further injurious breaches so long as AdaptHealth fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

135. In addition to a remedy for economic harm, Plaintiff and Class Members seek assurances that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

136. AdaptHealth disregarded Plaintiff's and Class Members' rights by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its electronic systems were protected against unauthorized intrusions; (b) failing to disclose that AdaptHealth did not have adequately robust security protocols and training practices in place to safeguard Plaintiff's and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

137. The actual and adverse effects to Plaintiff and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by AdaptHealth's wrongful actions and/or inaction and the resulting Data Breach require Plaintiff and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information,

instituting and/or removing credit freezes and/or closing or modifying financial accounts, for which there is a financial and temporal cost. Plaintiff and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

## CLASS ALLEGATIONS

138. Plaintiff brings this class action, individually and on behalf of the following Class:

> All natural persons, or, if minors, their parents or guardians, or, if deceased, their estates or surviving spouses, who reside in the United States or its territories and who were identified by AdaptHealth as being among those individuals whose Private Information was compromised by the Data Breach (the "Class").

139. Specifically excluded from the Class are AdaptHealth, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by AdaptHealth, and its heirs, successors, assigns, or other persons or entities related to or affiliated with AdaptHealth and/or its officers and/or directors, any judge assigned to this action, and any member of the judge's immediate family or staff.

140. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

141. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

142. Numerosity: The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class is comprised of over one million individuals. The Class is sufficiently numerous to warrant certification.

143. Typicality of Claims: Plaintiff's claims are typical of those of other Class Members because Mr. Gordon, like the unnamed Class Members, had his Private Information compromised

as a result of the Data Breach. Mr. Gordon is a member of the Class, and his claims are typical of the claims of the members of the Class. The harm he suffered and will suffer is similar to that suffered by all other Class Members, which was caused by AdaptHealth's same misconduct.

144. Adequacy of Representation: Mr. Gordon will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to or in conflict with the Class. Plaintiff has retained competent counsel who are experienced in data breach, consumer, and privacy class actions and other complex class action litigation and who will prosecute this action vigorously.

145. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members are relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, AdaptHealth will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

146. Predominant Common Questions: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including:

a. Whether AdaptHealth failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

b. Whether AdaptHealth knew or should have known that its data security systems and monitoring processes were deficient;

c. Whether AdaptHealth should have discovered the Data Breach sooner;

d. Whether AdaptHealth failed to provide timely notice of the Data Breach;

e. Whether AdaptHealth's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

f. Whether AdaptHealth's storage of Plaintiff's and Class Member's Private Information was done in a negligent manner;

g. Whether AdaptHealth had a duty to protect and safeguard Plaintiff's and Class Members' Private Information;

h. Whether AdaptHealth's conduct was negligent;

i. Whether AdaptHealth's conduct violated Plaintiff's and Class Members' privacy;

j. Whether AdaptHealth's conduct violated the statutes as set forth herein;

k. Whether AdaptHealth took sufficient steps to secure Plaintiff and Class Members Private Information;

l. Whether AdaptHealth was unjustly enriched; and

m. The nature of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

147. Information concerning AdaptHealth's policies is available from AdaptHealth's records.

148. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

149. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for AdaptHealth. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

150. Given that AdaptHealth has not indicated any changes to its conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiff and the Class)

151. Plaintiff incorporates by reference and re-alleges the factual allegations contained in paragraphs 1 through 137 as though fully set forth herein.

152. Plaintiff brings this claim individually and on behalf of the Class Members.

153. AdaptHealth knowingly collected, came into possession of, and maintained Plaintiff's and Class Members' Private Information and had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

154. AdaptHealth had, and continues to have, a duty to put in place and maintain procedures to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' Private Information.

155. AdaptHealth had, and continues to have, a duty to timely disclose that Plaintiff's and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

156. AdaptHealth owed, and continues to owe, a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, HIPAA, and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected individuals' Private Information.

157. AdaptHealth's duty of care to use reasonable security measures arose as a result of the special relationship that existed between AdaptHealth and Plaintiff and Class Members.

AdaptHealth was capable of ensuring that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

158. AdaptHealth's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because AdaptHealth is bound by industry standards to protect confidential Private Information.

159. AdaptHealth breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information.

160. The specific negligent acts and omissions committed by AdaptHealth include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems; and

c. Failing to periodically ensure that its computer systems and networks had plans in place to maintain reasonable data security safeguards.

161. AdaptHealth, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiff's and Class Members' Private Information within AdaptHealth's possession.

162. AdaptHealth, through its actions and/or omissions, unlawfully breached its duties to Plaintiff and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiff's and Class Members' Private Information.

163. AdaptHealth, through its actions and/or omissions, unlawfully breached its duty to timely disclose to Plaintiff and Class Members that the Private Information within AdaptHealth's possession might have been compromised and precisely the type of information compromised.

164. AdaptHealth breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the National Institute of Standards and Technology's Framework for Improving Critical Infrastructure Cybersecurity, HIPAA standards, and other industry guidelines. In violation of 15 U.S.C. § 45, AdaptHealth failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Members' Private Information. In violation of the FTC guidelines, inter alia, AdaptHealth did not protect the Private Information it keeps; failed to properly dispose of personal information that was no longer needed; failed to encrypt information stored on computer networks; failed to adopt reasonable authentication standards; lacked the requisite understanding of its networks' vulnerabilities; and failed to implement policies to correct security issues.

165. It was foreseeable that AdaptHealth's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

166. It was foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in injuries to Plaintiff and Class Members.

167. AdaptHealth's breach of duties owed to Plaintiff and Class Members caused Plaintiff's and Class Members' Private Information to be compromised.

168. But for AdaptHealth's negligent conduct and breach of the above-described duties owed to Plaintiff and Class Members, their Private Information would not have been compromised.

169. As a result of AdaptHealth's failure to timely notify Plaintiff and Class Members that their Private Information had been compromised, Plaintiff and Class Members were unable to take the necessary timely precautions to mitigate damages by preventing future fraud.

170. As a result of AdaptHealth's negligence and breach of duties, Plaintiff and Class Members are in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiff and Class Members have and will suffer damages including but not limited to: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services of labor without adequate data security.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

171. Plaintiff incorporates by reference and re-alleges the factual allegations contained in paragraphs 1 through 137 above as though fully set forth herein.

172. Section 5 of the FTC Act, 15 U.S.C. 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by AdaptHealth of failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information. Various FTC publications and orders also form the basis of AdaptHealth's duty.

173. AdaptHealth violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information and by failing to comply with industry standards.

174. AdaptHealth's conduct was particularly unreasonable given the nature and amount of Private Information obtained and stored and the foreseeable consequences of a data breach on AdaptHealth's systems.

175. Class Members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

176. Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

177. As a result of AdaptHealth's negligence per se, Plaintiff and Class Members have been harmed and have suffered damages, including but not limited to: damages arising from identity theft and fraud; out-of-pocket expenses associated with procuring identity protection and restoration services; increased risk of future identity theft and fraud, and the costs associated therewith; and time spent monitoring, addressing, and correcting the current and future consequences of the Data Breach.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

178. Plaintiff incorporates by reference and re-alleges the factual allegations contained in paragraphs 1 through 137 above as though fully set forth herein.

179. Plaintiff and Class Members conferred a benefit upon AdaptHealth by providing AdaptHealth with their Private Information.

180. AdaptHealth appreciated or had knowledge of the benefits conferred upon itself by Plaintiff. AdaptHealth also benefited from the receipt of Plaintiff's and Class Members' Private Information.

181. Under principles of equity and good conscience, AdaptHealth should not be permitted to retain the full value of Plaintiff's and Class Members' Private Information because AdaptHealth failed to adequately protect it. Plaintiff and the proposed Class would not have provided their Private Information to AdaptHealth had they known AdaptHealth would not adequately protect their Private Information.

182. AdaptHealth should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach it caused.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

183. Plaintiff incorporates by reference and re-alleges the factual allegations contained in paragraphs 1 through 137 above as though fully set forth herein.

184. Plaintiff and the Class provided and entrusted their Private Information to AdaptHealth. Plaintiff and the Class provided their Private Information to AdaptHealth as part of AdaptHealth's regular business practices and as a condition of receiving its goods and/or services.

185. AdaptHealth's Privacy Notice explicitly assured Plaintiff and the Class that it takes great care of their personal information to ensure their information was protected at all times.

186. In so doing, Plaintiff and the Class entered into implied contracts with AdaptHealth by which AdaptHealth agreed to safeguard and protect such Private Information, to keep such Private Information secure and confidential, and to timely and accurately notify Plaintiff and the

Class if their data had been breached and compromised or stolen, in return for the business services provided by AdaptHealth. Implied in these exchanges was a promise by AdaptHealth to ensure that the Private Information of Plaintiff and Class Members in its possession was secure.

187. Pursuant to these implied contracts, Plaintiff and Class Members provided AdaptHealth with their Private Information. In exchange, AdaptHealth agreed to, among other things, and Plaintiff and the Class understood that AdaptHealth would: (1) provide goods and/or services to Plaintiff sand Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class Members' Private Information; and (3) protect Plaintiff's and Class Members' Private Information in compliance with federal and state laws and regulations and industry standards.

188. Implied in these exchanges was a promise by AdaptHealth to ensure the Private Information of Plaintiff and Class Members in its possession was only used to provide for the agreed-upon reasons, and that AdaptHealth would take adequate measures to protect Plaintiff's and Class Members' Private Information.

189. A material term of this contract is a covenant by AdaptHealth that it would take reasonable efforts to safeguard that information. AdaptHealth breached this covenant by allowing Plaintiff's and Class Members' Private Information to be accessed in the Data Breach.

190. Indeed, implicit in the agreement between AdaptHealth and Plaintiff and Class Members was the obligation that both parties would maintain information confidentially and security.

191. These exchanges constituted an agreement and meeting of the minds between the parties.

192. When the parties entered into an agreement, mutual assent occurred. Plaintiff and Class Members would not have disclosed their Private Information to AdaptHealth but for the prospect of receiving services from AdaptHealth. Conversely, AdaptHealth presumably would not have taken Plaintiff's and Class Members' Private Information if it did not intend to provide Plaintiff and Class Members with its goods and/or services.

193. AdaptHealth was therefore required to reasonably safeguard and protect the Private Information of Plaintiff and Class Members from unauthorized disclosure and use.

194. Plaintiff and Class Members would not have entrusted their Private Information to AdaptHealth in the absence of their implied contracts with AdaptHealth and would have instead retained the opportunity to control their Private Information.

195. AdaptHealth breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiff's and Class Members' Private Information.

196. AdaptHealth's failure to implement adequate measures to protect the Private Information of Plaintiff and Class Members violated the purpose of the agreement between the parties.

197. As a proximate and direct result of AdaptHealth's breaches of its implied contracts with Plaintiff and Class Members, Plaintiff and Class Members suffered damages as described in detail above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against AdaptHealth, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and his

counsel as Class Counsel;

(b) For an order declaring that AdaptHealth's conduct violates the laws referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For an award of damages to the Plaintiff and Class Members, including actual, nominal, statutory, consequential, and punitive damages for each cause of action, as allowed by law in amounts to be determined at trial;

(e) For pre-judgment interest on all amounts awarded as allowed by law;

(f) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

(g) For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

(h) For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

(i) For an order awarding Plaintiffs the costs and disbursements of the action, along with reasonable attorney's fees, costs, and expenses;

(j) Ordering Defendants to pay for not less than 10 years of credit monitoring services for Plaintiff and the Class; and

(k) Such other and further relief as the Court deems necessary and appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: September 3, 2026 Respectfully Submitted,

*/s/ Roberta D. Liebenberg*
Roberta D. Liebenberg (PA Bar Id. 31738)

Sandra L. Duggan (PA Bar Id. 56420)
Gerard A. Dever (PA Bar Id. 85291)
Jessica D. Khan (PA Bar Id. 208875)
Joseph J. Borgia (PA Bar Id. 312511)
**FINE KAPLAN & BLACK**
One South Broad Street, Suite 2300
Philadelphia, PA 19107
T: (215) 567-6565
rliebenberg@finekaplan.com
sduggan@finekaplan.com
gdever@finekaplan.com
jkhan@finekaplan.com
jborgia@finekaplan.com